DAVID A. NELSON, Circuit Judge,
concurring.
I agree that the Union’s effort to enforce the 2001 version of the arbitration award is barred neither by the functus officio doctrine nor by the Ohio statute of limitations to which we must look in the absence of an applicable federal statute. Enforcement would be barred, however, if the decision rendered by the arbitrator in 2001, instead of being a clarification of a point left ambiguous in the 1998 award, constitutes a reversal of the “incentive rate” portion of that award. I write separately to outline my reasons for concluding that the 2001 decision is in fact a clarification of the earlier award and not a reversal.
I begin with the collective bargaining agreement, Article 21 of which establishes certain “base wage rates,” effective February 15, 1993, for each of six different wage grades. (An appendix to the agreement parcels out numerous individual job classifications among the six wage grades; under the heading “Glost Warehouse,” the appendix identifies a “Packer” classification that is assigned to “Wage Grade # 3” — albeit at a higher hourly rate ($7.35) than most other wage grade 3 jobs.) Article 21 goes on to prescribe a series of “general wage increases” that are to be “added to the base daywork rate” and “factored into base incentive rates” in accordance with a timetable set forth in the agreement. As far as the “Packer” classification is concerned, the appendix provides for periodic increases that culminate in a base rate of $7.67 per hour effective August 12,1996.
The traditional glost packer job was an “incentive job,” as company official Eric Fadale evidently explained in testimony before the arbitrator. The traditional glost packers initially received incentive pay geared to “down time and the amount of cartons that were packed in a given time frame,” according to a declaration executed by Mr. Fadale in December of 2001.[1]
*558 In his 1998 award sustaining the union’s grievance, the arbitrator held that although the employees who had packed Longaberger ware were entitled to the wage grade 3 rate for glost packer work, they were not entitled to the incentive rate:
“I am persuaded by the Company’s evidence with respect to the reasons for not applying the incentive rate to the Packers’ work on Longaberger ware. In establishing an incentive rate, the mechanized nature of the Glost Packer’s work on traditional ware is a factor which is entitled to great weight. Moreover, also of importance to the establishment of an incentive wage rate are such factors as a time study, proper sequence of the job and the allowances which are made, for example, with respect to ‘downtime’ or ‘machine breakdowns’. Although these factors are of great weight in establishing an incentive rate for the Glost Packer of traditional ware, ... the employees who have worked on the Longaberger ware are entitled to the same base wage rate as the Glost Packers of traditional ware. Accordingly, employees who have performed the Longaberger job since the fall of 1994 [when the Longaberger line was introduced], are entitled to receive the difference between the base wage rate that they were paid and the higher base rate that has been paid to the Glost Packer of traditional ware.” (Emphasis supplied.)
The evidence by which the arbitrator was persuaded that the incentive rate applicable to traditional glost packers should not be applied to Longaberger workers is summarized in the Fadale declaration as follows:
“In good industrial engineering practices, incentive systems are not portable. They cannot be moved from one job to the next just as a result of similarity. Incentive systems are designed for a specific job; they are based on the parameters of that job such as the amount of work that is being done if it is a piecework plan, parameters such as down time that would be incurred on the job, different things like that. The equipment would help drive the setup of it; it may not be a parameter in the determination of monies from the incentive system, but it would be a factor in setting up the initial incentive system.”
The incentive pay system for traditional glost packers was changed, at some point in time, to a system that simply added a fixed dollar amount to the packers’ hourly base rate. As the Fadale declaration explains,
“The numbers that were typically arrived at as a result of [the original] incentive system [were] turned into an hourly amount as a result of the existence of the previous incentive system. That amount is added on to the packers’ base rate.”
Because the amount of the add-on ($3 per hour) approximated numbers that had typically been produced under the incentive system designed for the traditional glost packing line, Mr. Fadale maintained that the add-on “could not be transferred” to the Longaberger work.
The arbitrator clearly was persuaded that the incentive rate could not be transferred, but it is not clear that he was persuaded the $3 add-on could not be transferred either. The company argues in its brief on appeal that the add-on “is the incentive rate,” but Mr. Fadale himself drew a distinction between the variable numbers generated by the incentive system and the fixed number by which the base rate was increased after the incentive system was turned into a fixed-hourly-amount system.
If I thought that the arbitrator understood the change in systems to have occurred before the fall of 1994, when the *559 company began producing items for Lon-gaberger, it would be difficult for me to avoid the conclusion that in saying the incentive rate could not be applied to the Longaberger work, the arbitrator must have meant that the $3 add-on could not be so applied. If there was no longer a true incentive system in place when the Longaberger line was introduced, what could the arbitrator possibly have been referring to, when he held “the incentive rate” inapplicable to Longaberger workers, other than the add-on that had evolved from the incentive system? If, on the other hand, the arbitrator understood that the incentive system was still being used in the fall of 1994, it is conceivable that the arbitrator was focusing on that system and was not focusing on the $3 add-on that subsequently replaced it.
I have found nothing in the record establishing what (if any) evidence was presented to the arbitrator as to when the variable incentive pay was replaced by the fixed add-on. Reading the arbitrator’s awards with the deference that must be accorded them, however, I conclude that the arbitrator must have understood the change to have occurred after the startup of the Longaberger line. And if that is what he thought, I believe that what the arbitrator said in 2001 can be reconciled with what he said in 1998.
The arbitrator did not say, in 2001, that Longaberger workers were entitled to the incentive rate that the packers of traditional glost ware were receiving, ex hypothesi, in the fall of 1994. Instead, as I understand him, he was saying that when the packers of traditional ware began receiving a composite rate determined by adding a flat $3 per hour to the base pay specified in the collective bargaining agreement, the Longaberger workers were entitled to begin receiving the same composite rate. The original decision not having made it clear whether Longaberger workers would or would not receive the composite rate once it was introduced for workers handling the traditional product, the arbitrator could have gone either way on this question without contradicting the original award.
I myself might think it wrongheaded, after denying Longaberger workers the incentive pay received by their counterparts on the traditional product line, to award the Longaberger people the $3 add-on when it replaced the incentive pay. It was not my opinion, however, by which the parties to the collective bargaining agreement undertook to be bound; what they bargained for was the arbitrator’s opinion, not mine. And I am not so sure it would be unreasonable to conclude that the considerations which precluded the transfer of a fluctuating incentive rate did not apply to the transfer of a rate which, unlike the incentive rate, never fluctuated in accordance with output or downtime. In any event, this is precisely the sort of determination the parties agreed to let the arbitrator make.
Regardless of one’s opinion as to its soundness, the 2001 decision was, in my judgment, a clarification of an ambiguity in the original award. As such, for reasons ably explained in Judge Clay’s opinion, the 2001 decision does not run afoul of the functus officio doctrine.
Under Ohio caselaw, moreover, the union’s request for enforcement of the arbi-tral award as clarified does not run afoul of Ohio Revised Code § 2711.09. Because the statute uses the word “may” in providing that within a one year period after an award has been made “any party to the arbitration may apply to the court of common pleas for an order confirming the award,” an Ohio court of appeals has held that “the common pleas court has the discretion to permit summary application [for ‘confirmation,’ which has the effect of turn *560 ing the award into a court judgment] within a reasonable time beyond one year for good cause shown, if no prejudice occurs to the opposing party.... ” Russo v. Chittick, 48 Ohio App.3d 101, 548 N.E.2d 314, 317 (1988). Here there was good cause for the union’s delay in applying for enforcement of the 1998 award, and the company was not prejudiced by the delay. As far as the 2001 decision is concerned, of course, there was no delay; the decision is dated April 4, 2001, and the union filed its enforcement application on August 16, 2001.
Ohio Revised Code § 2711.13, which says that after an arbitration award has been made any party to the proceeding “may file a motion in the court of common pleas for an order vacating, modifying or correcting the award,” uses mandatory language in establishing a deadline: “Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is delivered to the parties in interest....” Russo provides no escape from the three-month deadline for service of a motion to correct an award. I do not read the union’s counterclaim as asking for correction of the award at issue here, however. What the union asked for was a court order “enforcing the arbitrator’s award.... ” Ohio Revised Code § 2711.13 has no application to a judicial enforcement proceeding.
For all of the foregoing reasons, I concur in the affirmance of the judgment rendered by the district court.

. This declaration was intended to apprise the district court of the substance of testimony given by Fadale before the arbitrator on April 21, 1998. The district court questioned whether "declarations" can be given any consideration in summary judgment proceedings, since Rule 56(c), Fed.R.Civ.P., authorizes consideration of "affidavits,” not declarations. Under 28 U.S.C. § 1746, however, an unsworn declaration has the same force and effect as an affidavit if it recites — as Fadale's declaration does — that it was executed "under penalty of perjury.”